# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### BOWLING GREEN DIVISION
### CASE NO. 1:10-CR-42

UNITED STATES OF AMERICA                                    PLAINTIFF

V.

ROBERT A. WYATT                                             DEFENDANT

## MEMORANDUM OPINION & ORDER

This matter is before the Court upon Defendant Robert A. Wyatt's Motion to Suppress (DN 53). A suppression hearing was held on March 6, 2012. Pursuant to this Court's March 8, 2012 Order (DN 59), Defendant and the government filed briefs on the issue of Defendant's standing to challenge the alleged search (DN 60 and DN 63). This matter is now ripe for adjudication. For the following reasons, Defendant's Motion to Suppress (DN 53) is DENIED.

## BACKGROUND

On August 27, 2010, law enforcement officers executed a search warrant for the property located at 9823 Brownsford Road in Allen County, Kentucky. The property is approximately 120 feet by 120 feet, bordered by a fence on three sides and Brownsford Road on one side. There is a trailer home and a shop building, or garage, located on the property. A driveway runs between the two structures. It is now known that this property is owned by Defendant's father. At the time of the search, Defendant's girlfriend, Holly Bunch, lived in the trailer.[1] It is also now known that Defendant actually resided in a camper trailer in the backyard of his father's property located at 12383 Brownsford Road, approximately five or six miles from 9823 Brownsford Road.

---

[1] Defendant and Holly Bunch are now married.

1

This Court previously conducted a suppression hearing on April 19, 2011. The facts as known at the time are set forth in the Court's Memorandum Opinion and Order, dated July 29, 2011, denying Defendant's motion to suppress (DN 40). Defendant then filed an additional motion to suppress setting forth newly discovered evidence and additional issues. In this motion to suppress, Wyatt argues that the facts set forth in the Affidavit in support of a search warrant do not indicate a fair probability that evidence of a crime will be located at the premises of 9823 Brownsford Road in Allen County, Kentucky.

**I.   Testimony at April 19, 2011 Suppression Hearing**

In June of 2010, Detective Wimpee received a complaint concerning possible drug activity at 9823 Brownsford Road. This address was supposed to be the residence of an individual named Michael Wright. Based upon this complaint, Detective Wimpee and three other law enforcement officers attempted a "knock and talk" at 9823 Brownsford Road. Upon arriving at the residence, the law enforcement officers located Defendant. Detective Wimpee further testified that Detective Murphy, with the Kentucky State Police, identified Defendant and stated that he had recently gotten out of prison on drug charges. Defendant advised the officers that Mr. Wright had moved. The officers then left to go to Mr. Wright's home, where they performed the knock and talk.

In early August of 2010, the sheriff's hotline received an anonymous tip regarding drug activities at 9823 Brownsford Road. The anonymous caller stated that Defendant had a large methamphetamine cook set up in the garage at 9823 Brownsford Road. The caller also named Brandon Bradshaw, Jeff Pedigo, and Mitch (last name unknown) as being involved with Defendant and the drug activity. On August 4, 2010, the sheriff shared this tip with the local drug enforcement detectives, including Detective Wimpee. The detectives, with Detective

Wimpee leading, performed some investigation and surveillance, but were unable to uncover evidence of methamphetamine production.  They did, however, notice a vehicle parked at 9823 Brownsford Road whose owner had recently purchased a large but legal amount of pseudoephedrine.  Additionally, the detectives also noticed multiple vehicles parked at the premises on some days.[2]

On August 27, 2010, Detective Wimpee received a call from Detective Travis with the Drug Enforcement Special Investigation Unit of the Kentucky State Police.  Detective Travis stated that, while assisting the Barren County, Kentucky drug task force team do a search at a residence involving Brandon Bradshaw, Defendant's name was mentioned.[3]  A probation and parole officer, Jason Alexander, was also present at this search.[4]  Later the same day, Detective Travis again called Detective Wimpee and told him that he and "Wyatt's probation officer" were going to attempt a home visit on Defendant at 9823 Brownsford Road.[5]  Detective Travis was referring to Alexander; however, Alexander was not Defendant's probation officer.

When Detective Travis and Alexander arrived at 9823 Brownsford Road, two young men, Joe Wyatt and Dalton Wyatt, were present and performing yard work.  Alexander detained

---

[2] At the time of the April 19, 2011 hearing, it was believed that Defendant ran an auto-repair shop from the property, which was offered as an explanation for the large number of vehicles sometimes located on the premises.  At the March 6, 2012 hearing, testimony was offered that Defendant did not operate a business on the property.

[3] However, neither Detective Travis nor Detective Wimpee have provided the name of the person who mentioned Defendant's name to law enforcement.

[4] The exact nature of the visit to the Bradshaw residence is unclear.  There was some testimony that it was a search, and some testimony that it was a "knock-and-talk."

[5] At the time, the Defendant was on unsupervised parole.  Jason Alexander was not assigned to the county in which the Defendant currently lived.  However, the Defendant was very close to the county line and Alexander testified that he had statewide authority despite generally working out of a specific county, and that it was not unusual for him to visit neighboring counties.

Joe and Dalton Wyatt, asked Joe where Defendant was, and told Joe to call Defendant. Meanwhile, Detective Travis performed a protective sweep to make sure there were no other people at the residence.  While performing the sweep, Detective Travis went around the back of the residence and observed items that appeared to be used in the methamphetamine manufacturing process lying in plain view in the back yard.

Detective Travis then called Detective Wimpee to relay his observations.  Detective Wimpee thereafter came to the scene.  Detective Wimpee testified that, while standing in the driveway, he observed a black trash bag with a Windex bottle sticking out of the end that appeared to be a hydrogen chloride ("HCL") gas generator.  He testified that the bottle appeared to be half-full of a white substance and had a green cap with a hole in it.  Detective Wimpee testified that, based upon his experience, such devices are associated with the manufacture of methamphetamine.  Based upon this observation, Detective Wimpee decided to obtain a search warrant for the property located at 9823 Brownsford Road.

## II. The Affidavit

Detective Wimpee, the affiant, alleged that 9823 Brownsford Road was the residence of Defendant Robert Anthony Wyatt on August 27, 2010.  He further alleged that there was amphetamine, pseudoephedrine, chemicals and equipment used in the manufacture or trafficking of methamphetamine and other illegal drugs located at 9823 Brownsford Road based on an anonymous tip.  Detective Wimpee then alleges that there is probable cause that the property contained evidence of a crime based on the following:

(1) Affiant's seventeen years with the Kentucky State Police;

(2) The August 4, 2010 communication between the affiant and Sheriff Sam Carter, wherein Sheriff Carter stated the following: (a) that he believed Wyatt had a large methamphetamine operation at his residence at 9823 Brownsford Road, (b) that Wyatt was an anhydrous cook, (c) that Jeff Pedigo, Brandon

4

Bradshaw, and Mitch (last name unknown) were helping Wyatt, (d) that they were cooking three to four times a week, and (e) that on July 30, 2010, he had information that there were several guns at the residence along with 2-3 ounces of methamphetamine drying on the table, and cameras located on the property;

(3) An August 9, 2010 communication between the affiant and Detective Travis, wherein they were "trying to identify all the players in this deal;"

(4) An August 12, 2010 drive-by of the residence, which revealed no evidence of illegal activity;

(5) The August 25, 2010 drive-by if the residence, which revealed a vehicle owned by a person who had made a large but legal purchase of pseudoephedrine;

(6) Information received on August 24, 2010, that several vehicles were in and out of the shop on the property all day;

(7) The mention of Wyatt's name during a search of Brandon Bradshaw's residence;

(8) An independent investigation conducted at 10:05 a.m. on August 27, 2010, whereby the affiant drove by the residence and stayed in area for approximately 45 minutes;

(9) A communication from Detective Travis at approximately 12:30 p.m. stating that Detective Travis was with Tony Wyatt's probation officer and that they were on their way to Tony's house for a home visit;

(10)    A communication from Detective Travis that there were obvious signs of methamphetamine manufacturing in plain view in the back yard; and

(11)    Affiant Wimpee's own observation of a black garbage bag with a HCL generator sticking out of the bag in plain view and battery casings in a trash can.

Based upon this affidavit, a search warrant was issued for the property located at 9823

Brownsford Road.

## III. Additional Testimony at March 6, 2012 Hearing

At the March 6, 2012 hearing, evidence was presented that two other law enforcement

officers were actually present at 9823 Brownsford Road when Detective Travis and Alexander

attempted the home visit.  Rusty Anderson and Adam Minor of the Barren County Sheriff's Department arrived at the scene at approximately the same time as Alexander and Detective Travis.  Minor testified that he was asked by Detective Travis to assist him with investigating a drug complaint at the property.  He testified that neither Detective Travis nor Alexander told him they were at the property for a home visit.  Minor testified that, while he was at the scene, he did not walk around the property but observed other officers (more than one) walk around the back of the trailer and knock on the back door.  The presence of Minor and Anderson was not mentioned in the affidavit in support of the search warrant.  However, Detective Wimpee testified that he was not aware of their presence at the scene and was not aware that Detective Travis did not inform him of their presence.

There was additional testimony presented at the March 6, 2012 hearing that the shop building on the premises of 9823 Brownsford Road was not a business open to the public.[6] Detective Wimpee testified that, based on the presence of a vehicle in the garage and the presence of painting materials, the garage appeared to be an automobile body shop.  However, Detective Wimpee found no cash register, no check book, no license, no proof of insurance, and no sign indicating that a business was operating on the premises.  Joe Wyatt and Defendant both testified that Defendant's father purchased salvaged cars and Defendant worked on the cars in the shop building.

### STANDARD

The Fourth Amendment was established to protect "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S.

---

[6] In this Court's July 29, 2011 Memorandum Opinion and Order, the Court stated that the government's plain view argument was even more convincing in light of the fact that an auto repair facility, open to the public, was also run on the premises.

Const. amend. IV; *see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).  "[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation."  U.S. Const. amend. IV. The law does not require that every conceivable explanation other than a suspect's illegal conduct be ruled out in order to find probable cause; "[i]nstead, we need only consider whether there are facts that, given the factual and practical considerations of everyday life, could lead a reasonable person to believe that an illegal act has occurred or is about to occur."  *United States v. Strickland*, 144 F.3d 412, 416 (6th Cir. 1998) (citations omitted).  "To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search."  *United States v. Abboud*, 438 F.3d 554, 571 (6th Cir. 2006) (quoting *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)), *cert. denied*, 127 S. Ct. 446 (2006).  The Court applies a deferential standard of review.  *See United States v. Leon*, 468 U.S. 897, 914 (1984); *Massachusetts v. Upton*, 466 U.S. 727, 733 (1984).  The issuing judge's findings of probable cause should not be set aside unless arbitrarily made.  *United States v. Brown*, 147 F.3d 477, 484 (6th Cir. 1998).

## DISCUSSION

Defendant makes several arguments for suppression, some of which are the same as those previously asserted by Defendant and dismissed by the Court.  However, in light of the new evidence presented at the March 6, 2012 suppression hearing, Defendant asks this Court to again consider whether the facts set forth in the affidavit for a search warrant are sufficient to establish probable cause.  First, Defendant argues that several false statements contained within the affidavit in support of the search warrant were deliberately or recklessly made.  Second,

Defendant argues that Alexander did not have reasonable suspicion that Defendant was violating the conditions of his parole and was neither entitled to conduct a search of his residence at 12383 Brownsford Road nor conduct a search of the premises located at 9823 Brownsford Road.  The Court will examine each of these arguments in turn to determine whether any factual statements must be excised from the affidavit before making its determination on the issue of probable cause.

## I.   Whether Incorrect Factual Statements in Affidavit Were Made Deliberately or with a Reckless Disregard for the Truth

Defendant contends that several factual statements in the Affidavit, prepared by Detective Wimpee, were incorrect and were made knowingly or intentionally, or with a reckless disregard for the truth.  Specifically, Defendant points to the following assertions or omissions contained within the Affidavit: (1) that Defendant resided at 9823 Brownsford Road; (2) that on August 4, 2010, Detective Wimpee received information about events that occurred on August 9, August 25, and August 27; and (3) that the Affidavit did not state that two other law enforcement officers were present when Detective Travis observed the HCL generator.  Defendant argues that, but for the untrue information in the Affidavit, the Affidavit does not constitute probable cause to justify the issuance of the search warrant.

The Supreme Court, in *Franks v. Delaware*, 438 U.S. 154 (1978), held that a search based on a warrant that contained deliberately or recklessly false allegations is invalid unless the remainder of the affidavit is sufficient to establish probable cause.  "Thus, a court considering whether the suppress evidence based on an allegation that the underlying affidavit contained false statements must apply a two-part test: (1) whether the defendant has proven by a preponderance of the evidence that the affidavit contains deliberately or recklessly false

8

statements and (2) whether the affidavit, without the false statements, provides the requisite probable cause to sustain the warrant." *United States v. Charles*, 138 F.3d 257, 263 (6th Cir. 1998).

Here, the Affidavit in support of the search warrant incorrectly stated that Defendant resided at 9823 Brownsford Road.  At the March 6, 2012 suppression hearing, Detective Wimpee testified that he believed 9823 Brownsford Road was Defendant's residence.  As a basis for his belief, Detective Wimpee referred to the attempted knock and talk that occurred in June 2010, where Detective Wimpee was met by a shirtless Defendant in the driveway.  March Supp. Hearing, DN 61 at p. 7.  However, Detective Wimpee failed to further verify that Defendant resided at the property.  *Id*. at p. 18-20.

Defendant has not shown that Detective Wimpee deliberately  or recklessly made this false statement of residence.  At most, Detective Wimpee's statement was negligently made. There is no evidence that Detective Wimpee entertained serious doubts as to whether Defendant resided at 9823 Brownsford Road.  In fact, Detective Wimpee reasonably assumed that Defendant did in fact reside at the property based upon his own encounter with Defendant at 9823 Brownsford Road and the information relayed by Sheriff Carter that Defendant operated a methamphetamine operation at his residence at 9823 Brownsford Road.  Accordingly, Defendant has not proven by a preponderance of the evidence that Detective Wimpee deliberately or recklessly stated that Defendant resided at 9823 Brownsford Road.

Next, Defendant claims that Wimpee falsely stated that on August 4, 2010, he received information about events that occurred on August 9, August 25, and August 27.  The Court has carefully reviewed the Affidavit in support of the search warrant and finds that Wimpee did not state that on August 4, 2010, he received information about events that occurred on August 9,

August 25, and August 27.  His statement regarding the events of August 4, 2010 refer only to

the tip he received from Sheriff Sam Carter.  Accordingly, Defendant has not shown that this is a

false statement.

Finally,  Defendant claims that Detective Wimpee made a material omission in that the

affidavit did not state that two other law enforcement officers were present when Detective

Travis observed the HCL generator.  The Sixth Circuit has stated that "[a]lthough material

omissions are not immune from inquiry under Franks, we have recognized that an affidavit

which omits potentially exculpatory information is less likely to present a question of

impermissible official conduct than one which affirmatively includes false information."  *United

States v. Atkins*, 107 F.3d 1213, 1217 (6th Cir. 1997) (citing *United States v. Martin*, 920 F.2d

393, 398 (6th Cir. 1990)).  This is because "an allegation of omission potentially opens officers

to endless conjecture about investigative leads, fragments of information, or other matter that

might, if included, have redounded to defendant's benefit."  *Id*. (internal quotations omitted).

Here, there is no evidence that this omission was deliberately or recklessly made.  At the

March 6, 2012 suppression hearing, Detective Wimpee testified that he was not aware that

Detective Travis omitted this information when he spoke to him on August 27, 2010.  Detective

Wimpee further testified that, when he arrived at 9823 Brownsford Road that day, he met only

with Detective Travis and Alexander and did not know that Anderson and Minor were at the

property earlier.  Accordingly, Defendant has not proven by a preponderance of the evidence that

Detective Wimpee deliberately or recklessly omitted the fact that Minor and Anderson were

present at 9823 Brownsford Road on August 27, 2010.

In sum, Defendant has not met his burden of showing that any of the complained of

incorrect statements or omissions in the affidavit were deliberately or recklessly made by the

affiant.  Therefore, the Court need not excise these statements from the affidavit in making its determination of whether the affidavit provided probable cause.

## II.  Whether a Warrantless Search Occurred Prior to Obtaining Warrant

Defendant has alleged that the evidence of methamphetamine manufacturing discovered in plain view by law enforcement officers was a warrantless search because the law enforcement officers did not have a right to perform a search or conduct a protective sweep of the property located at 9823 Brownsford Road.  The government first contends that the HCL generator could be seen in plain view from the driveway.  The government further contends that Detective Travis observed the HCL generator in plain view while performing a protective sweep during the course of a parole-related home visit.

### a.  Defendant's Standing to Challenge Alleged Search

A defendant does not have the right to challenge a search unless he or she has a reasonable expectation of privacy in the residence.  *United States v. Washington*, 573 F.3d 279, 282 (6th Cir. 2009).  However, it is well established that the place to be search need not be the defendant's home in order for the defendant to have a legitimate expectation of privacy.  *United States v. Whitehead*, 415 F.3d 583, 587 (6th Cir. 2005).  This is because "[t]he Fourth Amendment protects people, not places, and provides a sanctuary for citizens wherever they have a legitimate expectation of privacy."  *Id.* (quoting *Minnesota v. Olson*, 495 U.S. 91, 96 n. 5 (1980)).  To establish a reasonable expectation of privacy, the defendant must show that (1) he had a subjective expectation of privacy and (2) his expectation was objectively reasonable.  *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000).  The defendant's expectation of privacy must be "one that society is prepared to recognize as legitimate."  *Id.*

11

Defendant argues that he has standing to challenge the alleged search based on the following facts: (1) the land, building, and home located at 9823 Brownsford Road was owned by Defendant's father and leased by Holly Bunch; (2) the building was utilized by Defendant with the permission of Defendant's father; (3) Defendant regularly did work at the building repairing vehicles exclusively for his father and would regularly check on the building for the benefit of his father; (4) Defendant had several items of personal property in the building; (5) Holly Bunch would often invite Defendant to visit inside the mobile home; (6) Defendant had items of personal property in the mobile home; (7) Defendant testified about the relative locations of the buildings, the clothesline, and the burn barrel in relation to each other and to the road and the fence; (8) Joe Wyatt described the shop building as "Tony's shop".

The Court finds that Defendant had a reasonable expectation of privacy in the property located at 9823 Brownsford Road, at least with regards to the shop and the yard. Defendant's access to the shop and to the yard was authorized and unrestricted. Defendant regularly worked in the shop repairing cars for his father. In fact, Defendant was present and working in the shop building so regularly that others referred to it as his shop. Defendant kept several items of personal property in the shop. Further, it is reasonable to assume that Defendant had the right to exclude others from the property, with the exception of his father and Holly Bunch. Accordingly, Defendant has standing to challenge the alleged search that occurred on the premises prior to law enforcement officers obtaining a search warrant.

### b.  Whether the HCL Generator was in Plain View

The government contends that the HCL generator could be seen in plain view from the driveway. The plain view doctrine is an exception to the requirement that police officers obtain a warrant prior to conducting a search. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

Pursuant to the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007) (quoting *Dickerson*, 508 U.S. at 375). Detective Wimpee testified that, when he arrived on the scene, he could observe a Windex bottle with a hole in the cap sticking out of a garbage bag in the burn barrel in plain view from his position in the driveway. He also testified that he immediately recognized the Windex bottle as a HCL generator.

First, the Court must determine whether Detective Wimpee was lawfully in a position from which to view the HCL generator. In this Court's July 29, 2011 Memorandum Opinion and Order denying Defendant's previous motion to suppress, the Court stated that the reason for the visit to the home was irrelevant because the HCL generator was seen in plain view from a location in which the observing officer could lawfully be present. The Court found the government's plain view argument even more convincing in light of the fact that Defendant operated an auto repair facility on the property. After reviewing the testimony and the photographs introduced at the March 6, 2012 hearing, the Court finds that there is no evidence that there was auto repair facility open to the public on the property.[7]

Having found that the property in question was not open to the public, the Court now must reconsider the government's plain view argument. Detective Wimpee testified that, when he observed the HCL generator, he was standing at the end of the driveway that goes between the residence and the garage. The driveway was close enough to the home to possibly constitute the

---

[7] At this recent hearing, as discussed above, Detective Wimpee testified as to factual basis of his opinion that Defendant operated a business out of the shop building located at 9823 Brownsford Road. The Court also heard from Defendant and others regarding the nature of the activities conducted in the shop building. Because there was no evidence that the shop building was a commercial business open to the public, the Court finds that Defendant did not operate a body shop that was open to the public.

13

curtilage protected by the Fourth Amendment. *See United States v. Jenkins*, 124 F.3d 768, 772 (6th Cir. 1997). The Supreme Court has set forth four factors to evaluate whether the area surrounding the home constitutes curtilage: (1) "the proximity of the area claimed to be curtilage to the home;" (2) "whether the area is included within an enclosure surrounding the home;" (3) "the nature of the uses to which the area is put;" and (4) "the steps taken by the resident to protect the area from observation by people passing by." *Id.* (quoting *United States v. Dunn,* 480 U.S. 294, 301 (1987).

The Court finds that the portion of driveway behind the home was within the protected curtilage of the home. The photographs admitted into evidence at the March 6, 2012 hearing show that the driveway is immediately adjacent to the home and extends from the road to the shop building set behind the home. At the end of the driveway, beyond the home, the driveway extends out to the side between the home and the shop building. A fence runs alongside the right of the driveway, and extends all the way around the property to border the relatively small property on three sides. Although not visible in the photographs, Defendant testified that there were 36-foot wooden trusses that blocked the driveway and prevented a vehicle from going past the house without driving onto the grass adjacent to the driveway. Detective Wimpee testified that when he arrived at the property, there were trusses laying to the right-hand side of the driveway. Detective Wimpee acknowledged that he had to walk between the trusses and the home in order to walk around between the building and the home. Additionally, a clothesline was present in the backyard area. Based upon these factors, the Court finds that the portion of the driveway located behind the home is protected curtilage. Because Detective Wimpee was standing within the protected curtilage, he was not lawfully in a position from which to view the HCL generator in the burn barrel.

14

Having found that Detective Wimpee was standing within the protected curtilage when he made his observations, the Court need not determine whether Wimpee could actually see the alleged HCL generator and whether the incriminating nature of the Windex bottle was immediately apparent.  However, even if Wimpee was lawfully standing on the driveway, the Court does not credit Wimpee's testimony that he immediately recognized the incriminating nature of the Windex Bottle.  First, the Court finds it unlikely that Wimpee could see a hole in the cap of a Windex bottle sticking out of a garbage bag from approximately 30 feet away. Second, prior to Wimpee making the observations from the driveway, Detective Travis told Wimpee that there was an HCL generator in the burn barrel.  Accordingly, the plain view doctrine does not apply with respect to the observations of Detective Wimpee.

### c.  Protective Sweep During Course of Home Visit

The government further contends that, while performing a protective sweep during the course of a parole-related home visit, Detective Travis observed the HCL generator in plain view.  Thus, the Court must determine whether the plain view exception to the warrant requirement applies with respect to Detective Travis's observations.

First, the Court must determine whether Detective Travis was lawfully in the position from which he observed the HCL generator–the backyard of the home located at 9823 Brownsford Road.  As part of the safety sweep, Detective Travis walked between the home and the garage into the back yard, around and behind the garage along the fence line, back up around the vehicles, and back to the front of the house.  As he traveled around the trailer, the burn pile caught his eye.  Detective Travis testified that "in plain view sticking out of the top of a garbage bag was what [he] recognized as an HCL generator, a hydrogen chloride gas generator, which contained salt and basically sulfuric acid."  Detective Travis then continued his safety sweep and,

15

after ascertaining that no one else was present, returned to where the others were in the driveway. Applying the *Dunn* factors discussed above, the Court finds that Detective Travis entered the curtilage of the home.  First, the Court previously found that the end of the driveway, in the area between the home and the shop building was protected curtilage.  Second, the backyard area cannot be seen from the street.  Third, intimate activities occur in the back yard, as evidenced by the clothesline.  Fourth, the yard was fenced in.

Because Detective Travis observed the HCL generator from the curtilage of the home, the Court must next determine whether Detective Travis was lawfully performing the protective sweep during the home visit to ensure the safety of the officers as they waited for Defendant to return to the property.  On August 27, 2010, Defendant was on inactive supervision parole.[8] Defendant's general conditions of parole, introduced into evidence at the April 4, 2011 hearing, stated that "I understand that my probation or parole officer may visit my residence or place of employment at any time.  I understand that I will maintain only one residence and shall not change my residence without approval of my officer."  Def. Exhibit A1; Apr. 4 Transcript, DN 32 at p. 57.  Although it is undisputed that Alexander was not Defendant's parole officer, Alexander testified that he was familiar with Defendant and that, in his experience, any officer could supervise a parolee and conduct a home visit.

Having heard that Defendant may be involved with manufacturing methamphetamine, Alexander decided to conduct a home visit to talk to Defendant.  It is of no significance that Alexander was accompanied on the home visit by Detective Travis and other law enforcement officers, and that law enforcement officers may have had their own investigatory objective.  *See*

---

[8] Alexander testified at the April 4, 2011 suppression hearing that this means that the parolee was not required to report to an officer.  However, an individual on inactive supervision parole is still required to adhere to all of the conditions of parole.  Apr. 4 Transcript, DN 32 at p. 52-53.

*United States v. Martin*, 25 F.3d 293, 296 (6th Cir. 1994) ("Furthermore, police officers and

probation officers can work together and share information to achieve their objectives.").  As the

Court of Appeals for the Second Circuit has stated, because a home visit is far less intrusive than

a probation search, a home visit is not subject to the reasonable suspicion standard set forth by

the Supreme Court in *United States v. Knights*,  534 U.S. 112 (2001).  *United States v. Reyes*,

283 F.3d 446, 462 (2d Cir. 2002).  "Indeed, it is difficult to imagine a situation where a probation

officer conducting a home visit in conjunction with law enforcement officers, based on a tip that

the probation officer has no reason to believe conveys intentionally false information about a

supervisee's illegal activities, would not be pursuing legitimate supervised release objectives."

*Id*. at 463 (citing *Martin*, 25 F.3d at 296)).  Accordingly, although the law enforcement officers

may have had their own objectives, Alexander was pursuing his own legitimate parole-related

objectives when he decided to conduct the home visit at 9823 Brownsford Road.

Having determined that Alexander was conducting a home visit at 9823 Brownsford

Road, the Court must determine whether the protective sweep performed by Detective Travis

was proper. The Supreme Court has sanctioned protective sweeps in two discrete circumstances:

> First, during a search incident to an arrest occurring inside a home, officers may
> "as a precautionary matter and without probable cause or reasonable suspicion,
> look in closets and other spaces immediately adjoining the place of arrest from
> which an attack could be immediately launched." Second, officers may conduct a
> search more pervasive in scope when they have "articulable facts which, taken
> together with the rational inferences from those facts, would warrant a reasonably
> prudent officer in believing that the area to be swept harbors an individual posing
> a danger to those on the arrest scene."

*United States v. Colbert*, 76 F.3d 773, 776 (6th Cir. 1996) (quoting *Maryland v. Buie*, 494 U.S.

325, 334 (1990)).

The Sixth Circuit has held that a protective sweep may be proper even if not done

incident to an arrest: "the principle enunciated in *Buie* with regard to officers making an arrest –

that the police may conduct a limited protective sweep to ensure the safety of those officers –
applies with equal force to an officer left behind to secure the premises while a warrant to search
those premises is obtained." *United States v. Taylor*, 248 F.3d 506, 513-14 (6th Cir. 2001).
However, protective sweeps not made incident to an arrest may only be conducted when the
police officers have gained lawful entry onto the premises. *See United States v. Archibald*, 589
F.3d 289, 297 (6th Cir. 2009) (emphasizing, in *Taylor*, 248 F.3d 506, the importance of the
defendant's brother's consent to the entry). To justify a protective sweep, officers "must
articulate facts that would warrant a reasonably prudent officer to believe that the area to be
swept harbored an individual posing a danger to those on the scene." *United States v. Biggs*, 70
F.3d 913, 915 (6th Cir. 1995).

Upon arriving at 9823 Brownsford Road, Detective Travis and Alexander encountered
Joe and Dalton Wyatt, Defendant's cousins. Joe and Dalton Wyatt told the officers that
Defendant was not there, and that they did not know where he was. Alexander testified that they
did not attempt to knock at the front door because they believed Joe and Dalton Wyatt.
Alexander further testified that they were going to wait at the premises until Defendant came
there. While Alexander waited with Joe and Dalton Wyatt in the driveway towards the front of
the home, Detective Travis performed a protective sweep to determine if there were any other
people on the premises. Detective Travis testified that, although he "didn't know if there was
anybody else there or not," he heard music playing from the garage and there were more vehicles
on the premises than there were people.[9] Detective Travis further testified that he knew
Defendant had past narcotics charges, and that he "[knew] that anytime you involve the drug
methamphetamine with human beings that it sometimes causes them to behave irrationally."

---

[9] Detective Travis testified that, at the time, he was not aware that the shop building on the
property was used to repair cars.

Apr. Transcript, DN 32 at p. 63.  Alexander added that he knew Defendant had been known to carry weapons in the past.  *Id*. at p. 49.

Considering Detective Travis's and Alexander's testimony regarding their articulated safety concerns, the Court finds that the protective sweep performed by Detective Travis was not reasonable under the circumstances.  Detective Travis and Alexander have not articulated facts that would warrant a reasonably prudent officer to believe that the area to be swept harbored an individual posing a danger to those on the scene.  Alexander testified that Joe and Dalton Wyatt told him that Defendant was not there, and that "[they] took their word for it."  DN 32 at p. 54.  Alexander and Detective Travis believed that Defendant was not there, as evidenced by their own testimony and their failure to knock on the front door of the home.  Thus, the fact that Defendant was known to carry weapons in the past is not a sufficient reason to perform the protective sweep.  Additionally, Detective Travis testified that he did not know if any other individuals were present but that he performed the protective sweep to find out.  Although there were cars present on the property, the officers could not detect the presence of any other individuals.  Importantly, even if they detected the presence of others, there is no evidence that other individuals would pose a danger to the officers.  *Cf. United States v. Stover*, 474 F.3d 904, 910-12 (6th Cir. 2007) (officers observed two cars parked in driveway of duplex – one registered to the defendant and the other to a local criminal who resided at a different address – and heard noises and movement in the house before the defendant came downstairs).  Accordingly, the government has not met its burden of providing sufficient facts to support a reasonable belief that a third party was present on the premises who posed a danger to the officers.  Thus, Detective Travis's warrantless sweep of the curtilage of the home was not justified.

**III.**  **Whether Officers had Reasonable Suspicion to Perform a Parole-Related Search**

The government has not argued that Detective Travis and Alexander performed a parole related search of 9823 Brownsford Road.  However, if a parole search did take place, then Detective Travis was lawfully in a position from which to view the HCL generator in the burn barrel.  For the sake of completeness, the Court will address whether or not a lawful parole search was justified under the totality of the circumstances.

The Sixth Circuit has explained that, when analyzing the validity of a probationary search, a court must conduct a two-pronged inquiry: "'First, [we] examine whether the relevant regulation or statute pursuant to which the search was conducted satisfies the Fourth Amendment's reasonableness requirement.  If so, [we] then analyze whether the facts of the search itself satisfy the regulation or statute at issue.'"  *United States v. Henry*, 429 F.3d 603 (6th Cir. 2005) (quoting *United States v. Loney*, 331 F.3d 516, 520 (6th Cir. 2003).

Pursuant to statutory authority, the Kentucky parole commissioner has issued a policy that authorizes a parole officer to conduct a warrantless search of the person and property of a parolee upon a reasonable suspicion that the parolee is in possession of contraband.  See Corrections Policies and Procedures 27-16-01 (Amended Dec. 9, 2008), incorporated by reference in 501 KY. ADMIN. REGS. 6:0202 (1998).   The Kentucky policy states that "[a]n offender shall be subject to a personal search, search of his residence, or any other property under his control.  The basis for any search shall be substantiated by reasonable suspicion that the performance of the search may produce evidence to support the alleged violation."  *Id*.  The policy further provides that "[i]f an officer has reasonable suspicion to believe that an offender is in possession of contraband or in violation of the conditions of his supervision, the officer may conduct an investigation and search to validate the suspicion or information received."  *Id*.

Kentucky defines "reasonable suspicion" for purposes of parole searches as "a less stringent standard than probable cause that requires no more than that the authority acting be able to point to specific and articulable facts that taken together with rationale inferences from those facts, reasonably warrant a belief that a condition of probation or parole has been or is being violated." *Id*.; *Coleman v. Commonwealth*, 100 S.W.3d 745, 754 (Ky. 2002).  The Sixth Circuit has previously concluded that Kentucky's policy is reasonable under the Fourth Amendment.  *Henry*, 429 F.3d at 609.

Having determined that the Kentucky policy is reasonable, the Court now must determine whether there was reasonable suspicion to perform the search.  "Reasonable suspicion is based on the totality of the circumstances and has been defined as requiring 'articulable reasons' and 'a particularized and objective basis for suspecting the particular person . . . of criminal activity." *United States v. Payne*, 181 F.3d 781, 788 (6th Cir. 1999) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).  When the reasonable suspicion is based largely upon anonymous tips, as is the case here, "courts have been willing to find reasonable suspicion based on either the government's having corroborated some aspects of a detailed tip or the informant's having a proven track record of providing reliable information."  *Id*. at 790.

Here, Alexander had reasonable suspicion that Defendant was involved in the manufacturing of methamphetamine, in violation of the terms or conditions of his supervision. Law enforcement officers received complaints that Defendant was manufacturing methamphetamine at 9823 Brownsford Road.  The complaint was detailed, as it stated the other individuals involved in the manufacturing, the frequency of the "cooking," and the date on which methamphetamine and guns were at the residence.  Surveillance discovered the presence of a vehicle owned by a person who had recently purchased large, albeit legal, amounts of

21

pseudoephedrine.  *See Alabama v. White*, 496 U.S. 325, 331-31 (1990) (holding that reasonable suspicion existed based on a detailed anonymous tip that was corroborated, even though the corroborating evidence was of innocent activities).  On the day of the search, Defendant's name was mentioned in connection with a search or a "knock-and-talk" at the home of one of the individuals previously named by the source.  Finally, the information did not suffer from staleness as the anonymous tip indicated an ongoing activity.  *Cf. Payne*, 181 F.3d at 790 (holding that reasonable suspicion did not exist because anonymous tip was unreliable and contained no indication of ongoing activity).  All of these facts, taken together, provided reasonable suspicion that Defendant was in possession of contraband or in violation of the conditions of his probation.

Because there was reasonable suspicion that Defendant was in possession of contraband or in violation of the conditions of his probation, the warrantless search of 9823 Brownsford Road was not unreasonable under the Fourth Amendment.[10]  This is especially true in light of Defendant's significantly diminished privacy interests as a result of his parolee status.  *See United States v. Knights*, 534 U.S. 112, 121 (2001) (holding that "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable").

Further, it is irrelevant that a law enforcement officer performed the "search" of the premises or that he may not have subjectively intended to do a parole-related search.  In *Knights*,

---

[10] It could also be said that Defendant consented to the search, as his conditions of release state that "I understand that I shall be subject to search and seizure without a warrant if my officer has reasonable suspicion that I may have illegal drugs, alcohol or other contraband on my person or property."  However, because neither Kentucky courts nor the Sixth Circuit have reached this issue, the Court declines to assert this reason as a basis for upholding the warrantless search.  *See Henry*, 429 F.3d at 614-15.

the Supreme Court upheld a warrantless search of a probationer's residence performed by a law enforcement officer with no involvement of a parole officer.  534 U.S. 112.  There, the law enforcement officer was investigating acts of vandalism and arson directed at Pacific Gas & Electric.  *Id*. at 115.  After conducting surveillance at the defendant's home, the officer entered the driveway and observed suspicious objects in a truck.  *Id*.  Aware of the search condition in the defendant's probation order, the officer then conducted a search of the defendant's apartment.  *Id*.  The defendant's search conditions in *Knights* provided that the defendant would submit to a search "by any probation officer or law enforcement officer."  *Id*. at 116.  However, the Supreme Court did not address whether the defendant consented the search, holding instead that the warrantless search required only reasonable suspicion.[11]  *Id*. at 121.  The Supreme Court noted that "[b]ecause our holding rests on ordinary Fourth Amendment analysis that considers all the circumstances of a search, there is no basis for examining official purpose.  With the limited exception of some special needs and administrative searches, we have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers."  *Id*. at 122 (internal citations and quotations omitted).

Thus, because the search performed by Detective Travis was supported by reasonable suspicion, there is no basis to examine the official purpose behind his actions.  The Court cannot conclude that Defendant's severely diminished privacy expectation was violated by Detective Travis's minimally intrusive search of the property.  Because of the existence of reasonable suspicion to perform a search, Detective Travis was lawfully in the place from which he viewed the HCL generator in the burn barrel.  Accordingly, the Court may consider this fact in making

---

[11] The Supreme Court also disagreed with the Court of Appeals view that a warrantless search of a probation satisfies the Fourth Amendment only if it is a "special needs" search conducted by a probation officer monitoring whether the probationer is complying with probation restrictions. *Knights*, 534 U.S. at 117-18.

its determination of whether the affidavit in support of the search warrant provided probable cause.

IV. **Whether Remainder of Affidavit Establishes Probable Cause**

The Affidavit in support of the search warrant in this case included information regarding Detective Wimpee's observations from a vantage point within the curtilage.  Because the Court has determined that this information was discovered illegally, that information cannot be used to support the search warrant. *See United States v. Davis,* 430 F.3d 345, 357–58 (6th Cir.2005). The remedy is to "remove th[ose] fact[s] from the affidavit when considering whether there is still sufficient information to establish probable cause to" issue the search warrant. *Id.* However, having found reasonable suspicion for a search of the property, the Court may consider Detective Travis's observations of the obvious signs of methamphetamine manufacturing in plain view in the back yard.

The Court finds that the remaining factual allegations in the affidavit are sufficient to establish probable cause.  The anonymous tips were corroborated by Detective Travis's own lawful observations of the HCL generator in the burn pile in the back yard of the property.  In addition, the anonymous tips were sufficiently detailed and were not stale.  As discussed above, the source named the other individuals involved in the manufacturing, the frequency of the "cooking," and the date on which methamphetamine and guns were at the residence. Furthermore, the tip concerned an ongoing operation.  Accordingly, the affidavit contains facts that indicate a fair probability that evidence of a crime will be located on the premises of 9823 Brownsford Road.  *See Abboud*, 438 F.3d at 571

### CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (DN 53) is DENIED.

24